## Missouri, Kansas & Texas Railway Company of Texas v. W. D. Mayfield.

### Decided May 10, 1902.

**1.—Railway Company—Negligence—Violation of Rules.**

Ordinarily it is not negligence per se for an employe to violate a rule of the employer, but the question of negligence in such case is one for the determination of the jury.

**2.—Same—Charge.**

Where the charge instructed that the rules of the railway company given in evidence had been issued by the company to govern its employes in the operation of trains; that it was the duty of employes to observe them, and if they failed to use ordinary care in doing so, they would be guilty of negligence, and that if plaintiff failed to have his train under control, as required by the rules, in approaching the station where the injury occurred, he could not recover, it was not error to refuse special charges quoting the rules and instructing that if plaintiff violated them and in doing so was guilty of a want of ordinary care and brought about his injury, to find for defendant.

**3.—Same—Custom.**

Evidence of a custom for train crews to leave switches open while trains were switching, as was done in plaintiff's case, did not require a charge in relation thereto where it was not shown that plaintiff had any knowledge of such custom and he and the fireman testified that a different custom prevailed.

**4.—Same—Contributory Negligence.**

In an action for injury to an engineer whose train ran into an open switch and collided with another train switching there, it was proper, on the issue of contributory negligence, to show that a rule of the company required in such cases that a man be sent ahead by the switching train to flag approaching trains.

**5.—Same.**

Where there were no yardmen at the station where the injury occurred, a rule of the company that station agents are responsible for the position of switches at stations where no yardmen are employed was admissible in evidence.

**6.—Same—Waiver of Rule—Nonobservance—Evidence.**

Where a rule is habitually disregarded within the knowledge of the com-

pany, it is waived, and to show such waiver of a rule requiring trains to be under full control while passing stations plaintiff had the right to show the rate of speed of other trains in passing the station where the accident occurred.

**7.—Same—Fact Case.**

Evidence held to show that the defendant company was guilty of negligence in leaving a switch open and unguarded, and that plaintiff, an engineer, was not guilty of contributory negligence in running into it.

**8.—Pleading and Proof—Personal Injuries.**

An averment of injury to plaintiff's chest, abdomen, kidneys, and hips will support proof of injury to the muscles of the bladder, causing incontinence of urine, it being shown that the bladder is part of the abdomen.

Appeal from Grayson.   Tried below before Hon. Rice Maxey.

*T. S. Miller* and *Head & Dillard,* for appellant.

*Wolfe, Hare & Semple,* for appellee.

RAINEY, Chief Justice.—Suit by appellee to recover damages for personal injuries received while in the employ of appellant as locomotive engineer.

Appellee at the time of the accident was an engineer on a locomotive engine drawing a freight train over appellant's road. As the train approached Pilot Point, a telegraph station, it ran into an open switch onto a side track and collided with another train standing on said side track. Just before the trains collided the appellee, in order to escape the consequences of the collision, jumped from his engine and was injured. The train, No. 104, which appellee was in charge of, was a north-bound time-table through freight carrying cattle and fruit, and was entitled to the right of track. The train, No. 67, with which it collided was a south-bound local freight. It had reached Pilot Point before No. 104 and pulled in on the north end of the siding. Having some switching to do, the engineer pulled the engine with some cars attached out of the siding at the south end onto the main track and then backed in at the south end onto the siding where the collision occurred, leaving the side switch open. No flagman was left at the switch and the target on the switch which connected with the main line, that is, the switch to the passing track, was so dim that the different colors could not be distinguished at a distance of more than 200 feet. Appellee did not see the open switch but saw the order board out as he came down into the station, and, expecting to stop with his caboose at the depot, so manipulated his air as to accomplish this object, and in doing this he reduced the amount of his braking power. When he ran in on the switch he made an emergency application of the air but got only a service application. He had about 1400 feet in which to stop with his caboose at the depot. He had only 600 feet in which to stop before striking the engine of train No. 67. He was unable to stop within this distance. Appellee was operating his train under the fol-

lowing orders which had been delivered to him at Denton, seventeen miles south of Pilot Point: "C. & E. 1st and 2nd 38 & 104. No. 67 Eng 270 has until 3k P. M. to make Pilot Point for Do 1st and 2nd & No. 104.

> "B.
> "12 W. S. P.
> "B.
> "J. H. Walker
> "Mayfield."

With reference to the meaning of these orders appellee testified, and in this he was not contradicted, as follows: "Under our orders we were to make Pilot Point at 3 p. m. if we could, but we were 11 minutes and 30 seconds late. If my train had gotten into Pilot Point at 3 o'clock or before and 67 had not been there it would have been my duty under the rules and order to remain there until 3:05, and if 67 had not gotten there by that time, then it was my duty to pull out. I had the right of track. If my train had arrived there at 3 o'clock or any time before five minutes after 3 o'clock, and if 67 had not been there, I would have occupied the main track with my train between the switches. No. 67 being on the track when I arrived, if no board had been out I would have had the right and would have gone through Pilot Point without stopping, because I had the right of track. I did not see No. 67 until I ran in upon the switch. My train was north bound; 67 was south bound. The engine was way back off to the left from the main line. I had a wait order for this train. The difference between a wait order and a meeting order is that on the first I wait at the station named until a certain time. If the train has not reached the station named at the time named I have a right to proceed, and the train waited for does not concern me any more than if the order had not been issued. I don't have to wait for him. I simply wait until the time is up. If the opposing train can not make the station named by the time mentioned in the order, he is supposed to head in at some switch or station and be in clear at or before the time mentioned in the order. * * * If the opposing train does not make the place named, I don't know where he is going to make, and he has no right against me outside of that order, and if he is not at the next place he may be at the next."

The following rules promulgated by appellant were in force at that time:

Rule No. 2, under Rights of Trains, which is as follows: "All time-table freight trains, going north or east, have the absolute and indefinite right against all freight trains going south or west. A time-table freight train going north will not leave any station or passing place where, by the time table, it should meet a freight train going south, until five minutes after its own leaving time, unless south-bound train has arrived there; and this five minutes, allowed for possible variations of watches, must be observed at every succeeding station or siding until the expected

train is met. The south-bound train must not, under any circumstances, use any portion of the five minutes allowed for variation of watches."

Rule No. 11, under Rights of Trains, which is as follows: "When trains are to meet or pass each other, the train having the right to the road will occupy the main track between the switches, and the train having to take the siding will go in at the nearest end, and not run by to back in; but, if obliged from any cause to pull up and back in at the farthest end of the switch, a man must first be sent ahead a sufficient distance to flag approaching trains. When necessary to put the ruling train on the siding, a man must be sent ahead far enough to stop the train before it reaches the first switch, and until this train arrives and stops, the nonruling train will lay back a sufficient distance to guard against all possibility of accident."

Rule No. 22, under Special Instructions, which is as follows: "Station agents will be responsible for the proper position of all switches in the main tracks at stations where no yard crews are employed."

Paragraph 3, under General Notice, which is as follows: "All employes whose duties are to any extent prescribed in these rules, are required to keep a copy of the same in their possession, which they will carefully study; all its instructions must be fully understood and obeyed. When an individual enters or remains in the service of the company, it will be considered as in itself an expression of willingness to render such obedience, and to fully abide by these instructions."

Rule No. 6, under Special Instructions, which is as follows: "All trains and engines must approach telegraph stations under full control, their engineers keeping a sharp lookout for red signals to stop for orders."

Rule No. 14, under Special Instructions, which is as follows: "Engineers of all regular or special trains or engines must approach and pass all principal stations, and run within all yard limits under full control, first seeing that the main track is clear for their trains. They must also reduce speed at all obscure switches and important bridges. This rule will not allow the obstruction of the main track by yard engines, nor excuse any failure to post proper signals for protecting all trains."

Rule No. 16, under Special Instructions, which is as follows: "Conductors and engineers, and all employes interested, must frequently read and be sure they understand all the general and special rules and regulations, and they must observe them strictly at all times, both on the main line and also on the branches."

Rule No. 11, under Duties of Conductors and Engineers and Trainmen, which is as follows: "All trains and engines must approach stations and water tanks under control, expecting to find another train occupying the main track. Engineers will run very carefully by all switches and see that they are set right. They will guard against accidents likely to occur from stock being on the track, and when stock is killed or seriously injured, report the fact to the stock agent or superin-

tendent, at the end of the trip, giving kind of stock and locality as near as possible."

Going north there is a hill before reaching the station at Pilot Point. From the top of the hill it is down grade to the depot and beyond. There is a slight curve in the track between the hill and the depot, but there is a clear open run from the top of the hill to the station. The maximum limit of 104 was thirty-five miles an hour between stations. It was running about that rate when the top of the hill was reached. Then steam was shut off, and after turning the hill the air was applied and the train slowed down so as to stop the train with the caboose opposite the station. Before getting to the top of the hill appellee did not expect to stop at the station, but after reaching the top he saw the order board out and slowed down to make the stop. The train was supplied with air brakes and the appellee had the train under sufficient control to stop at the station. When he discovered he was going to run into the switch he was running at the rate of about twenty miles an hour, and he then used the means at hand to prevent the collision, but without avail.

Appellee was not guilty of contributory negligence, and the evidence showed negligence on the part of appellant, and warranted the verdict and judgment.

*Conclusions of Law.*—1. The court refused a special charge asked by appellant, as follows: "If you believe from the evidence that the defendant had prescribed certain rules for the running of the train on which plaintiff was engineer, and that those rules were in full force and effect, and that plaintiff knew this, and that he violated such rules, and because of such violation received his injury, you will inquire no further but will return a verdict for the defendant." This was properly refused. Ordinarily it is not negligence per se for an employe to violate a rule of the company, but is a question for the jury to determine. There is nothing in the evidence that takes this case out of the general rule, and the court properly submitted the question to the jury. Railway v. Sweeny, 36 S. W. Rep., 800; Railway v. Adams, 58 S. W. Rep., 831; Railway v. Mortinsen, 66 S. W. Rep., 99; Railway v. Pawkett, decided by this court March 9, 1902.

2. Assignments of error second and third complain of the action of the court in refusing to give third and fourth special charges requested by appellant. Said instructions called attention to rules of the company numbers 6 and 14 respectively, quoting them, and further, in effect, that if they were violated and plaintiff was guilty of a want of ordinary care in so doing and brought about his injury, to find for defendant. The court in its general charge told the jury, in effect, that the rules in evidence (which included numbers 6 and 14) had been issued by defendant to govern its employes in the operation of its trains. That it was the duty of employes to observe them, and if they failed to

use ordinary care in doing so they would be guilty of negligence, and that if plaintiff failed to have train No. 104 under control in approaching Pilot Point, he would be guilty of negligence and he could not recover. The undisputed evidence shows that the main track was clear and this was seen by the plaintiff. The only other requirement of the rule is that on approaching such a station the train must be under control, and on this last point the court correctly instructed the jury. The court's charge sufficiently covers the points covered by the special charges, and it was not error to refuse to give them.

3. The court correctly charged the jury on contributory negligence, and it was not error to refuse the requested charges on this issue.

4. The court did not err in refusing appellant's requested charges relating to the custom of leaving switches open. Some of the witnesses testified that it was the custom for train crews to leave switches open when trains were switching as was done under the circumstances by the crew of No. 67. It was not shown that plaintiff had any knowledge of such a custom. On the contrary, he and the fireman on 104 testified that a different custom prevailed. Under the facts the requested charge was not warranted.

5. Under the allegations of plaintiff's petition it was not error to admit testimony showing injury to the muscles of the bladder, incontinence of his urine, etc. The allegations were that he was injured "by having his ribs broken, by having his back sprained and wrenched, and received other painful and permanent injuries to his arms, shoulders, chest, abdomen, kidneys, hips, and legs, which render him a permanent cripple for life. It was shown that the urinary organs are contained in and a part of the abdomen. This also disposes of the other assignments of error relating to the admission of evidence as to the character of appellee's injuries. Railway v. Edling, 45 S. W. Rep., 406; Railway v. White, 51 S. W. Rep., 366; Railway v. McMannewitz, 70 Texas, 78; Railway v. Kelton, 28 Texas Civ. App., 137; Railway v. Bibolet, 24 Texas Civ. App., 4.

6. Over the objection of appellant the court permitted plaintiff to introduce in evidence the following rule of defendant, viz: "11. When trains are to meet or pass each other, the train having the right to the road will occupy the main track between the switches, and the train having to take the siding will go in at the nearest end and not run by and back in; but if obliged from any cause to pull up and back in at the farthest end of the switch, a man must be first sent ahead a sufficient distance to flag approaching trains." The testimony of appellee and his witnesses shows that this rule had been interpreted as requiring a flagman to be placed at an open switch to warn approaching trains when trains were switching as was No. 67, and we are not prepared to say that it was susceptible of such a construction. Anyway it was properly admitted on the question of contributory negligence, in view of said testimony.

7.   The admission of the following rule was not error, viz: "Station agents will be responsible for the proper position of all switches on the main track at stations where no yard crews are employed." There was no yard crew employed at Pilot Point. It being the duty of the station agent to see that switches were in proper position was a circumstance that was proper for the consideration of the jury on the issue of contributory negligence.

8.   It was competent to show the rate of speed of other trains passing through Pilot Point. The issue was made that appellee had violated the rules in not having his train under control and running at too great a rate of speed. The evidence conflicted on this issue, and the testimony complained of tended to show the customary rate of other trains, and was a circumstance proper to be considered by the jury in determining whether the published rules of the company relating to having "trains under control" in operating trains at stations had been disregarded sufficiently to constitute a waiver thereof by the management, which was pertinent on the issue of negligence of appellee in violating the rules of the appellant in the operation of the train. Whether the rules had been habitually disregarded by the employes was an issuable fact for the jury, and if the appellant knowingly permitted their nonobservance it is in no attitude to complain of a nonobservance in this case.

9.   The evidence warranted a finding that appellant's employes were negligent in leaving the switch open under the circumstances and that appellee was not guilty of contributory negligence.

10.   Under the evidence we do not feel warranted in holding that the verdict, though large, was excessive.

11.   We find no reversible error in the record, and the judgment is affirmed.

*Affirmed.*